# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**04-839**
**consolidated with 04-976**

KEVIN D. LAWSON, ET AL.

VERSUS

MITSUBISHI MOTOR SALES
OF AMERICA, INC., ET AL.

************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. 99-3876,
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

************

**MICHAEL G. SULLIVAN**
**JUDGE**

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Michael G. Sullivan, Judges.

**WRIT GRANTED; AFFIRMED; AND RENDERED.**

Rex D. Townsley
The Townsley Law Firm
3102 Enterprise Boulevard
Lake Charles, Louisiana  70601
(337) 478-1400
Counsel for Plaintiffs/Appellants:
    Kevin Lawson, Individually and on behalf of his minor son, Dillon Lawson
    Kelli Lawson, Individually

Keith W. McDaniel
Lance B. Williams
McCranie, Sistrunk, Anzelmo, Hardy,
Maxwell & McDaniel
434 North Columbia Street, Suite 200
Covington, Louisiana  70433
(504) 831-0946
Counsel for Defendants/Appellants:
    Mitsubishi Motor Sales of America, Inc.
    Mitsubishi Motor Manufacturing of America, Inc.
    Tokio Marine and Fire Insurance Company, Ltd.

SULLIVAN, Judge.

In this products liability case, Mitsubishi Motors North America, (Mitsubishi) appeals the trial court's grant of the plaintiffs' motion for judgment notwithstanding the verdict (JNOV) on the issue of liability. The plaintiffs, Kevin and Kelli Lawson, appeal the trial court's failure to determine causation and damages when it considered and granted their motion for JNOV on the issue of liability. For the following reasons, we affirm the JNOV and award damages.

### *Facts and Procedural Background*

In September 1997, Kevin and Kelli Lawson purchased a 1996 Mitsubishi Galant with 21,930 miles on the odometer from J.P. Thibodeaux Mitsubishi in Lake Charles. Kelli was the primary driver of the Galant, driving it to and from work and for errands. On Saturday, January 9, 1999, as she was driving away from her home to run errands, she honked the horn. When she did, the Galant's driver-side air bag deployed, injuring both of Kelli's thumbs and her right wrist. Kevin and Kelli's two and one-half year old son, Dillon, was in the car with Kelli; he was not physically injured.

Kevin and Kelli filed suit against Mitsubishi and its insurer, Tokio Marine and Fire Insurance, alleging that the deployment of the air bag resulted from a manufacturing defect and that warnings regarding the air bags were inadequate pursuant to the Louisiana Products Liability Act, La.R.S. 9:2800.51-.60. The matter was tried to a jury from September 29 through October 8, 2003. The jury rendered a verdict in favor of Mitsubishi, finding that the Galant was not unreasonably dangerous in construction and that it was not unreasonably dangerous in failing to prove an adequate warning regarding the air bag.

Kevin and Kelli filed a motion for JNOV, and Mitsubishi filed a motion to tax costs. After a hearing on the motions, the trial court took the matter under advisement. On January 26, 2004, the trial court issued its Judgment and Reasons in which it granted the motion for JNOV on the issue of liability only and denied Mitsubishi's motion to tax costs. The trial court granted a new trial "on the sole issues of causation and damages" and, alternatively, granted a new trial in the event the JNOV was reversed on appeal.

Kevin and Kelli appeal, assigning as error the trial court's denial of the JNOV on the issue of causation and damages. Mitsubishi appeals and assigns as error the trial court's grant of the JNOV. Mitsubishi also filed a writ application in which it asserts that the trial court's grant of a new trial was error. *See Lawson v. Mitsubishi Motor Sales of America, Inc.*, 04-976 (La.App. 3 Cir. __/__/04), ___So.2d ___. Consideration of the writ application has been consolidated with this appeal.

### *Discussion*

**Judgment Notwithstanding the Verdict**

Louisiana Code of Civil Procedure article 1811 governs motions for JNOV. A JNOV should be granted "only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover." *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 832 (La.1991). If the motion is opposed with evidence "which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied." *Id.* The credibility of the witnesses is not to be considered by the reviewing court, and "all reasonable inferences or factual questions should be

2

resolved in favor of the non-moving party." *Id.* On appeal, the same criteria are applicable to determine whether the motion was properly granted. *Id.* If "reasonable men in the exercise of impartial judgment might reach a different conclusion," the motion was erroneously granted. *Id.*

### *Liability*

The trial court granted the motion for JNOV. Applying the doctrine of *res ipsa loquitur*, the trial court concluded that the jury's verdict was unreasonable because the Lawsons "proved through competent evidence that, more probable than not, the clockspring was misaligned at the time of manufacture, and that this was the most plausible explanation for this highly unusual accident." Mitsubishi argues that the trial court incorrectly applied the Louisiana Products Liability Act (LPLA) and the doctrine of *res ipsa loquitur* to the motion for JNOV.

### *The Louisiana Products Liability Act*

The LPLA establishes the exclusive theories of recovery against manufacturers for damage caused by their products. La.R.S. 9:2800.51-.60. Section 2800.54 provides that a manufacturer is liable for damage caused by a characteristic of a product which renders it "unreasonably dangerous." La.R.S. 9:2800.54(A). There are only four ways in which a product can be unreasonably dangerous: construction or composition; design; an adequate warning concerning use of the product was not provided; or it does not conform to an express warranty made by the manufacturer. La.R.S. 9:2800.42(B).

On appeal, the Lawsons assert that the Galant was unreasonably dangerous in construction or composition. A product is unreasonably dangerous in construction or composition "if, at the time the product left its manufacturer's control, the product

3

deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." La.R.S. 9:2800.55.

### *Res Ipsa Loquitur*

A plaintiff's burden of proof in a civil suit is generally preponderance of the evidence. He can satisfy his burden of proof with direct or circumstantial evidence. *Sonnier v. Bayou State Mobile Homes, Inc.*, 96-1458 (La.App. 3 Cir. 4/2/97), 692 So.2d 698, *writ denied*, 97-1575 (La. 10/3/97), 701 So.2d 201. Circumstantial evidence is "evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred." W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 39, at 242 (5th ed. 1984). When direct evidence of a defendant's negligence is not available, the doctrine of *res ipsa loquitur* assists the plaintiff in presenting a prima facie case of negligence. *Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr.*, 564 So.2d 654 (La.1989). *Res ipsa loquitur* is applicable when the circumstances surrounding an accident are so unusual as to give rise to an inference of negligence or liability on the part of the defendant and that, under such circumstances, the only reasonable and fair conclusion is that the accident resulted from a breach of duty or omission on the part of the defendant. *Id.*

If applicable, the doctrine allows the trier of fact to infer negligence from the circumstances of the event. *Id.* Generally, three criteria must be present for the doctrine to be applicable: 1) the facts must indicate that the plaintiff's injuries would not have occurred in the absence of negligence; 2) the plaintiff must establish that the defendant's negligence falls within his scope of duty to plaintiff; and 3) the evidence should sufficiently exclude inference of the plaintiff's own responsibility or the

4

responsibility of others besides defendant in causing the accident. *Id.* Because the standard of proof is preponderance of the evidence, not proof beyond a reasonable doubt, the plaintiff's evidence need only exclude all other reasonable explanations for his injuries; it need not "conclusively exclude all other possible explanations for his injuries. . . ." *Id.* at 664.

The doctrine of *res ipsa loquitur* is applicable to product liability cases. *See State Farm Mut. Auto. Ins. Co. v. Wrap-On Co., Inc.*, 626 So.2d 874 (La.App. 3 Cir. 1993), *writ denied*, 93-2988 (La. 1/28/94); 630 So.2d 800; *see also Precht v. Case Corp.*, 99-1296 (La.App. 3 Cir. 2/16/00), 756 So.2d 488, *writ denied,* 00-0791 (La. 5/5/00), 761 So.2d 546.

The Lawsons' Galant is equipped with dual air bags. Dual air bags are constructed to deploy simultaneously[1] in frontal type collisions where the automobile decelerates rapidly, not individually and not when the horn is honked. The deployment of Kelli's air bag when she honked her horn is extremely unusual. There was no evidence of any prior occurrence of this nature, and none of the experts questioned on the issue had any knowledge of an air bag deploying in this manner.

The Lawsons presented the testimony of William Rosenbluth, an expert in the forensic analysis of electronic component vehicle controls and failure analysis of air bag systems, to establish that the Galant was unreasonably dangerous in construction or composition. Mr. Rosenbluth opined that the Galant's clockspring was misaligned at the time it was installed, that, as a result of the misalignment, the clockspring

---

[1] Dual air bags will not deploy at the same time when the passenger air bag has an on/off switch and the switch is turned off. There is no evidence that the Galant was equipped with an on/off switch for the air bags.

5

progressively deteriorated, causing it to fail, and that the failure of the clockspring caused Kelli's air bag to deploy when she honked the horn.

A clockspring is a device which bundles together electrical wires for automotive equipment that is controlled from the steering wheel, e.g., cruise controls, blinkers, and radios. It is installed in the steering column under the horn and looks similar to an octopus: it has a round central portion from which independent insulated bundles of wires extend like tentacles. This construction maintains the integrity of the electrical wires and prevents loss of contact in the electrical circuits when the steering wheel is turned.

Mr. Rosenbluth explained that there are two circuits for the dual air bags of the Galant. These circuits are parallel and act as one switch. When closed, the switch activates the driver and passenger air bags at the same time. Therefore, these circuits were not operating properly when only the driver-side air bag deployed. Mr. Rosenbluth testified that the clockspring totally malfunctioned when he investigated the Galant and that it was the only component in the electrical system that his investigation revealed was not functioning properly. He explained that fault codes are stored in the computer equipment of the Galant and that Mitsubishi downloaded the codes in an attempt to determine the cause of the deployment. Dr. Rosenbluth further testified that there were six fault codes and that all of them were associated with the clockspring doing things that "weren't right."

Mr. Rosenbluth pointed to a Technical Service Bulletin (TSB) issued by Mitsubishi in 1999 as additional support for his conclusion that the clockspring malfunctioned as a result of misalignment. TSBs are prepared by manufacturers and sent to repair technicians concerning repair issues. Mr. Rosenbluth explained that the

TSB at issue informed technicians that there could be an open circuit which might cause an air bag not to deploy as expected and that, if an open circuit was found in the clockspring, misalignment could be the problem. In his opinion, the clockspring failed here as contemplated by the TSB, but in a different manner—the air bag deployed instead of not deploying. Mr. Rosenbluth found nothing, other than the misalignment of the clockspring, which would have caused Kelli's air bag to inadvertently deploy, and he found no evidence of anything occurring between the factory and the accident which would have changed the condition or alignment of the clockspring.

David Bliese, a mechanical engineer for Mitsubishi, testified regarding the quality control checks that vehicles and their component parts go through during the manufacturing process. He further testified that Mitsubishi's documentation of the Galant did not reveal any problems identified during the inspections performed on it during manufacturing. With regard to the clockspring, he testified that clocksprings are manufactured and supplied to Mitsubishi by another entity. The supplier aligns the clocksprings during the manufacturing process, locks them, and inserts a pin to keep them aligned during shipping and installation. When the clocksprings are received by Mitsubishi, arrows on the exterior of the clocksprings indicate that they are properly aligned and Mitsubishi does not verify that they are properly aligned and centered before installing them. Mr. Bliese contradicted Mr. Rosenbluth's testimony that the TSB at issue addressed misalignments of clocksprings which may have occurred during the manufacturing process, testifying that TSBs are directed to repair personnel to address repair concerns only, not manufacturing concerns, and that concerns which arise during the manufacturing process are addressed only within the

7

manufacturing plants. However, he did admit that a TSB may precede a recall, which indicates that TSBs do address manufacturing concerns.

Michael Klima, an expert in mechanical engineering with a specialty in automobile design and manufacturing assembly as related to secondary restraint systems, testified on behalf of Mitsubishi. He inspected the Galant and found nothing consistent with it having been in a collision which would have caused the driver-side air bag to deploy. Mr. Klima testified that x-rays of the clockspring revealed "a disruption" in the wiring and that "something wasn't right" with it. He also testified that the clockspring "did not perform correctly" and that it "stopped performing as it should have during the life of the vehicle." He further testified that misalignment of a clockspring can occur, if the shipping lock installed by the manufacturer comes off before it is installed in the vehicle, and that misalignment can cause something unfortunate, like the deployment in this case, to happen. Mr. Klima would not agree that a manufacturing defect caused this deployment because the clockspring had been removed from the Galant and, in his opinion, could have been misoriented by people handling it during the investigation of the accident.

Mitsubishi theorized that there was work performed on the Galant which could have caused the clockspring to malfunction. It points to the fact that the Galant was owned by three parties, one a rental company, and to the lack of documentation by the Lawsons of their maintenance on the Galant to argue that the Lawsons have not excluded such work as the cause of the clockspring's malfunction. Specifically, Mitsubishi insinuates that because the Lawsons drove the car for more than 25,000 miles, but did not produce receipts for oil changes or other repairs, that they are "hiding" something. Mr. and Mrs. Lawson testified that, other than routine oil

8

changes, they did not have any work performed on the Galant. Mr. Lawson testified that he had changed the oil himself and had had it changed by third parties, but, on those occasions, he did not keep the receipts.

While Mitsubishi asserts that there may have been work performed on the Galant which caused the misalignment of the clockspring, it does not point to any specific repair which would have misaligned the clockspring. Furthermore, there is no evidence of any such work having been performed, just inferences that some repair work may have been performed and that if any repair work was performed it may have misaligned the clockspring. To defeat the application of the doctrine of *res ipsa loquitur*, an inference must be reasonable. These assertions are not reasonable under the evidence presented.

Mr. Rosenbluth testified that he knew of only two things that could have caused a misalignment of the clockspring after it was installed by the factory and that there was no evidence that either of these occurred. He also testified that, because the Galant had a warranty of five years or 60,000 miles, any necessary repairs would have been warranty work and that one would reasonably expect an owner to have warranty work performed at a dealer at no charge instead of paying for it. There is no documentation of any warranty work having been performed on the Galant.

As part of their investigation of the accident, the Lawsons had the Galant examined by two electrical automotive mechanics who do air bag replacements. The mechanic who removed the clockspring from the Galant testified in detail regarding the process that he followed, explaining that the steering column must be removed before the clockspring can be removed and that when he dismantled the steering column he could hear the paint on the steering column screws "pop" as he loosened

9

them.  This popping sound indicated to him that the screws had not been removed since it left the factory, and he concluded that the steering column had not been opened after it left Mitsubishi.

Mitsubishi also asserts that diagnostic information downloaded from the Galant indicates the warning light for the SRS, air bags, had been illuminated for 7,737 minutes before the accident, that the Lawsons should have taken the Galant to a Mitsubishi dealer to have it checked as instructed by warnings contained in the Owner's Manual, the glove box, and the driver side visor, and that, if they had, any problem with the air bags would have been identified and repaired.  Kevin, Kelli, Kelli's sister, Kim, and Kelli's father testified that they drove the car before the accident and never saw the SRS warning light illuminated.  Kelli's father drove the Galant the morning of the accident and testified that he did not see the SRS warning light illuminated.  Mitsubishi urges that, because the SRS warning light was illuminated *after* the accident, it was illuminated *before* the accident; therefore, the Lawsons should have seen it.  However, Mr. Rosenbluth testified that the accident itself would have caused the SRS warning light to illuminate, and Mr. Klima admitted that, if the key had been left in the "on" position after the accident, the 7,737 minutes could have accrued after the accident.

Gary Nelson, an expert in safety engineering, human factors, and safety management testified for the Lawsons.  He testified that a warning, such as the SRS warning light, does not warn against a manufacturing defect.  Alan Dorris, an expert in human factors, ergonomics, and warnings who testified for Mitsubishi, agreed that a manufacturing defect is not a warning issue.  However, Mr. Dorris further testified that a warning light "indicates circumstances that may include manufacturing issues"

10

and alerts the driver that the condition needs to be addressed, i.e., "if you know something is wrong, you should fix it." The Lawsons argue that Mr. Dorris' opinion is without merit because the SRS warning light warns of the potential non-performance of the air bags in a collision, not that there is a defect in the car which could result in deployment of the air bag when the horn is honked.

The Owner's Manual defines the SRS to include the SRS warning light and air bag modules and states that "[t]he air bags are designed to inflate only in certain moderate to severe frontal collisions." There is no information in the Owner's Manual or the other warnings that an air bag can deploy when the horn is honked or that the SRS warning light is intended to warn that an air bag can deploy in any situation other than a moderate to severe frontal collision. The LPLA provides that a warning is intended to "lead an ordinary reasonable user . . . to *contemplate the danger* in using . . . the product and to either decline to use it or, if possible, to *use or handle the product in such a manner as to avoid the damage for which the claim is made.*" La.R.S. 9:2800.53(9) (emphasis added).

The information provided by Mitsubishi to the Lawsons would cause them to contemplate that continued use of the Galant without having the SRS system checked could result in them being harmed by non-deployment of the air bags in a moderate or severe frontal collision; it would not lead them to contemplate that continued use of the Galant without having the SRS system checked could result in them being harmed by deployment of the driver-side air bag when the horn is honked. Accordingly, we conclude that, even if the SRS warning light was illuminated before the accident, the Lawsons' failure to bring the Galant to the dealer to have the SRS system checked is not an impediment to their recovery.

Our review of the evidence reveals that the trial court properly applied the doctrine of *res ipsa loquitur* to the facts herein and properly granted the motion for JNOV. It is clear that Kelli's injuries would not have occurred in the absence of negligence and that installation of a properly aligned clockspring in the Galant is within Mitsubishi's scope of duty to the Lawsons. The evidence excludes any reasonable inference of anything other than misalignment of the clockspring causing Kelli's air bag to deploy and establishes that this misalignment, more probably than not, occurred during the manufacturing process. There is no evidence that anything other than the clockspring caused the air bag to deploy as it did, and there is no reasonable inference that anything occurred after the manufacturing process which would have caused the air bag to deploy as it did. Therefore, we agree with the trial court that the only conclusion reasonable men could reach in this case is that Kelli's injuries were caused by a manufacturing defect in the Galant.

Mitsubishi urges that the trial court improperly applied the doctrine of *res ipsa loquitur*, noting that the doctrine allows, but does not require, an inference of negligence. In our view, Mitsubishi's argument is simply another attack on the trial court's grant of the motion for JNOV. The trial court determined that the facts of this case warranted application of the doctrine and that through application of the doctrine the Lawsons proved by a preponderance of the evidence that the Galant contained a defect. Consequently, the trial court concluded that the jury ignored its instruction on the doctrine of *res ipsa loquitur* and that its failure to apply the doctrine in this case was unreasonable. For the reasons previously discussed, we agree and find no merit in this argument.

***Damages***

In its writ application, Mitsubishi urges that the record contains all of the evidence necessary to decide the issues of causation and damages; therefore, remand of this matter for a determination of these issues as ordered by the trial court is unnecessary. We agree, and the Lawsons agree. The writ is granted. *See* La.Code Civ.P. art. 2164; *Gonzales v. Xerox Corp.*, 320 So.2d 163 (La.1975); *Gordon v. Willis Knighton Med. Ctr.*, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, *writs denied* 95-2776, 95-2783 (La. 1/26/96), 666 So.2d 679.

***Kelli***

Kelli seeks general damages for pain and suffering and special damages for past and future medical expenses, past lost wages, and loss of earning capacity. When her air bag deployed, Kelli did not know what had happened, except that she was in excruciating pain. She was panicked and screaming.

Both of her thumbs were injured, the right worse than the left. Immediately after the accident, she went to the hospital emergency room where it was determined that her thumbs were fractured. Both thumbs were wrapped, and she was sent home with instructions to go to an orthopedic surgeon the following Monday. Kelli saw Dr. Dale Bernauer, an orthopedic surgeon, on Monday, January 11, 1999. Dr. Bernauer testified that both of Kelli's thumbs were fractured and that she was in a lot of pain on her first visit. Due to her injuries, Kelli could not use her hands, and Dr. Bernauer described her as "helpless."

Dr. Bernauer described the fracture of her left thumb as minimal. He splinted her thumb, and it healed well. Her right thumb was much worse. Her right thumb was torn off the bone, and the bone was broken. Dr. Bernauer operated and inserted

pins in the right thumb to hold the bone together. Her thumb and wrist were casted, and she was required to wear a sling to prevent the pins from dislodging.

Kelli's right thumb and wrist were in a cast for six weeks. Once the pins were removed from her right thumb and she began moving it, she did not regain use of it as quickly as Dr. Bernauer expected. Physical therapy did not provide much relief, and Kelli developed right wrist pain. Dr. Bernauer believed she was developing reflex sympathetic dystrophy, a malfunctioning of the nerves. He testified that Kelli was in much pain and that it was impossible for her to work at that time.

Kelli felt that Dr. Bernauer was not adequately addressing her complaints of pain in her right wrist, and, in June 1999, she went to Dr. Darrell Henderson, a plastic and reconstruction surgeon, for a second opinion. During his thirty plus years of practice, Dr. Henderson has developed an emphasis on surgery of the hand and wrist. Dr. Henderson explained that Kelli's right thumb suffered a severe break at the bottom of the bone, where an important ligament attaches to keep the bone from going too far sideways. He further testified that it takes a tremendous amount of force to break the bone there because the ligament is literally pulled off the bone and that, if there is enough force to break the thumb, many times it will injure the radial side of the wrist. Dr. Henderson was not surprised that Kelli did not complain of pain in her right wrist until she began physical therapy after her right thumb was healed and the cast was removed because her wrist was immobilized with her thumb until then.

Initially, Dr. Henderson believed that Kelli's pain was caused by an incipient ganglion cyst between the scaphoid and lunate bones of the wrist which was pushing those bones apart. In July 1999, he did surgery and determined that a tear in the

scapholunate ligament, not a cyst, was causing her pain. He sutured the tear, hoping it was a solid repair which would allow good healing. Dr. Henderson explained that, due to the length of time between the accident and the repair, there was a fifty percent chance that the repair would not be successful; however, he did the surgery, hoping to preserve Kelli's wrist and to avoid the need for a fusion in the future. Unfortunately, the surgery was not successful, and Kelli continues to suffer pain.

Dr. Henderson has prescribed Celebrex or Vioxx daily for the rest of Kelli's life to reduce inflammation and pain in her wrist, explaining that movement of her wrist will cause arthritis to develop and, eventually, she will have constant pain. He testified that, because of the arthritis she will undoubtedly develop, it is just a matter of time until she will require a partial fusion of her wrist and that the less she uses her wrist, the longer she will be able to go without a partial fusion. According to Dr. Henderson, a partial fusion will relieve 95-97% of Kelli's pain but will allow her only 50% movement of her wrist; it requires one to one and one-half years for recovery. Approximately one year later, hardware installed during the fusion will have to be removed. Dr. Henderson further testified that a partial fusion usually lasts about ten years. Because of Kelli's young age at the time of her injury, twenty-four, he is of the opinion that she will ultimately require a full fusion, which will greatly restrict her use of her right hand. Physical therapy will be required, and the hardware will have to be removed approximately one year later. Dr. Henderson also testified that Kelli will probably require a carpal tunnel release after the full fusion.

Dr. Henderson explained that he recommended a partial fusion then a full fusion, rather than a full fusion only, because a full fusion will restrict Kelli's ability to do much of the intricate work that women do with their hands on a daily basis. He

15

also recommended routine, ongoing care for Kelli, including return visits every six months with fluoroscopies and range of motion and strength determinations.

Mitsubishi questions whether Kelli's injuries are as severe as she claims or simply a means for her to stay home with her children; she has had two children since the accident. Kelli was sent to Dr. Eric George, a plastic surgeon, and Paul Fontana, a physical therapist, for independent medical examinations. The physical therapist's report was utilized by Dr. George and Karen Keller, Mitsubishi's vocational rehabilitation expert, to form their opinions.

Dr. George questioned the extent of Kelli's injuries and testified that she did not exhibit full effort during his examination, indicating to him that she was a malingerer and that she magnified her symptoms. He also questioned the treatment recommended and provided by Dr. Henderson, testifying that the injury to Kelli's right thumb was so well-healed that he could not determine that it had been broken. In his opinion, she had only a 2% impairment of her right thumb. With regard to her right wrist, he testified that there were very little pathophysiological findings to indicate that it was injured. While he found some residual stiffness, he was of the opinion that Kelli did not require any future treatment. Additionally, he testified that there was no evidence in Kelli's medical treatment that she suffered a torn ligament as a result of this accident. Specifically, he testified that he believed that, if Kelli had a scapholunate ligament injury, it would have taken precedence over her broken thumbs because it is such a painful injury.

Dr. Bernauer was questioned regarding Dr. Henderson's treatment of Kelli's wrist injury. He testified that Dr. Henderson's finding of a scapholunate ligament injury was consistent with his findings, and he agreed with Dr. Henderson that Kelli's

injury would limit her ability in the job market. However, he testified that the repair could not be accomplished by simply suturing the torn ligament, as described by Dr. Henderson, because it is too small.

Dr. Henderson is Kelli's treating physician and has many years of experience. He thoroughly explained his findings and why the injury warranted the treatment he provided. The surgery revealed the true cause of Kelli's continued wrist pain, and he was the one who performed the surgery. We find no merit in the criticism of Dr. Henderson's prior course of treatment and recommended future treatment for Kelli.

Kelli, Kevin, and Kelli's sister, Kim, testified regarding Kelli's injuries and the effect they have had on her. As Dr. Bernauer testified, Kelli was helpless and totally dependent on others immediately after her accident. While her left thumb healed fairly quickly, she continued having pain in her right hand. She went to physical therapy for six weeks for her right thumb and hand, which she testified was extremely painful. She testified that the more she tried to get back into a regular routine after the accident, the more pain she suffered. She continues to suffer pain and instability in her wrist. She testified that sometimes her right wrist and hand get so stiff that she has to run hot water over them to relieve the stiffness.

In November 1999, Kelli attempted to return to her job at the Fourteenth Judicial District Clerk of Court's office. Kelli and her supervisor testified that she was unable to perform the job duties of the position she held at the time of her accident and that the other positions she attempted to perform, even though modified to some extent, required her to use repetitious movements of her right hand which caused her pain. Kelli testified that she had to take frequent breaks to relieve the

17

cramps and stiffening that occurs when she uses her right hand. She also testified that she attempted performing her work with a splint on her wrist but could not because it hampered her work performance. Kelli explained that she left her job at the Clerk of Court's office because she could not perform her work without pain and she feared that her hand would worsen and require surgery sooner than estimated by Dr. Henderson. Kelli and Kevin testified that she had planned to work in the Clerk of Court's office until she could retire.

Dr. Henderson testified that most of the jobs females customarily perform are not good for Kelli's wrist because they require repetitious movement of the hands which will ultimately lead to a partial fusion and a total fusion at earlier ages. Consequently, he explained that Kelli can work, but her ability to do so is reduced. He restricted her employment to light to sedentary positions with limited repetitious movement.

Kelli is limited in the activities she can do at home: she can wash and dry laundry but cannot fold it; she cannot vacuum or mop the floors; she must take frequent breaks during her daily routine to relieve her right wrist; she has had to modify the way she picks up her children, putting her right arm under their arm and lifting with her elbows instead of her wrists; and she cannot play with her children as she would if she had not received this injury. She can no longer enjoy her hobbies of bowling, cross-stitching, and gardening, and her ability to write with her right hand is limited.

Kelli's continuing problems with pain in her right hand limit her ability to care for herself and her family and work outside the home. She is right hand dominant and has tried to become more efficient using her left hand to reduce the pain in her right

wrist which occurs with use. She often wears a brace, yet her wrist still hurts and swells. She still requires much assistance from Kevin and Kim. Kim testified that Kelli attempts to do the same things she did before the accident, but she pays for it with pain and cramps.

Kelli suffered two very painful injuries in the accident. One of those injuries has limited her ability to work, interact with her family, and enjoy her hobbies. Dr. Henderson's testimony reflects that she has much pain and suffering and greater limitation ahead of her. She has undergone three surgical procedures and faces another five. We find that the sum of $200,000.00 will fairly compensate her for her injuries. We recognize that this amount is higher than reported awards for injuries requiring a partial or complete fusion for a wrist; however, Kelli is much younger than any of the plaintiffs in those cases, and she will have to undergo more medical treatment in the future than the plaintiffs in those cases.

Damages for past and future medical expenses and for past lost wages and loss of earning capacity are special damages. They can be established to a reasonable mathematical certainty or with relative certainty. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70; *Whitehead v. Kansas City S. Ry. Co.,* 99-896 (La.App. 3 Cir. 12/22/99), 758 So.2d 211, *writ denied*, 00-209 (La. 4/7/00), 759 So.2d 767. Kelli's past medical expenses are documented as $29,387.31. Pursuant to Dr. Henderson's testimony, Dr. Bernard Pettingill, Jr., the Lawsons' economist, testified that the present day value of Kelli's future medical expenses is $182,150.00. Dr. Pettingill calculated Kelli's past lost wages and benefits for the periods January 9, 1999 through November 1999 and May 2000 through the trial to be $61,319.00. This figure represents Kelli not earning any wages for the first period due to the accident

and her injuries and her earning $5.15 to $6.00 per hour for the second period. We award these amounts as special damages.

Kelli also seeks an award for loss of earning capacity. Her job with the Clerk of Court required repetitive movement of her hands, especially her right hand which is her dominant hand. She returned to work but was unable to continue, even though her employer attempted to accommodate her needs.

In *Batiste v. New Hampshire Insurance Co.,* 94-1467, p. 3 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied,* 95-1413 (La. 9/22/95), 660 So.2d 472 (citation omitted), this court explained the relationship between income and earning capacity:

> [E]arning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.

In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.

Kelli urges that she should be awarded $882,074.00 for loss of earning capacity because she cannot return to employment. This figure represents her salary and fringe benefits from the time of trial until she is sixty-five, the duration of her work life. Dr. Henderson testified that Kelli can perform job duties that are classified as sedentary or light and do not require repetitive movements of her right hand; however, she urges that she would not be hired for any job she may be qualified for

20

because of these limitations, combined with her need for continuing medical treatment and the pain associated with her injury.

The parties presented the testimony of vocational rehabilitation counselors on this issue; their opinions were diametrically opposed. Glenn Hebert testified that Kelli is "employable" but not "placeable," while Karen Keller testified that she could return to her position with the Clerk of Court with some modifications and that she could even earn greater wages in other positions for which she is qualified, like real estate property manager, or could become qualified with additional training or education. Additionally, while Mr. Hebert testified that Kelli would have a difficult time obtaining additional training or higher education because she would be limited in her ability to take notes, Ms. Keller testified that universities and other institutions of higher learning adhere to the Americans with Disabilities Act and allow modifications for students with impairments which aid them in obtaining a degree.

We have given much consideration to the evidence regarding Kelli's ability to work, especially Dr. Henderson's testimony that she can perform light to sedentary work which does not require repetitious use of her right hand, and conclude that $500,000.00 will adequately compensate her for her loss of earning capacity.

### Kevin

Kevin has asserted a claim for loss of consortium. He testified regarding the effect of Kelli's injuries on him and their relationship, observing that since the accident he has had to do much more work in the home than he did before the accident. He observed that this is his responsibility as Kelli's husband but admitted that, at times, it is a burden on him and their relationship. Kevin also testified that he and Kelli have tried not to allow the accident to disrupt their plans and had two more

children. However, he further testified that Kelli has changed because she is limited in what she can do and is often depressed because of her limitations and pain.

The elements of a loss of consortium claim are loss of society, sex, service, and support. Society includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price. *Broussard v. Romero*, 96-973 (La.App. 3 Cir. 2/26/97), 691 So.2d 1265, *writ denied*, 97-670 (La. 4/25/97), 692 So.2d 1092. We find that an award of $35,000.00 will fairly compensate Kevin for his loss of consortium with Kelli.

### Dillon

Dillon was two and one-half years old at the time of the accident. He witnessed the accident and Kelli's initial pain and disorientation. Kelli testified that the deployment of the air bag created a lot of smoke, and led Dillon to believe that she was on fire. Kelli further testified that, immediately after the accident, Dillon did not understand why she could not pick him up and hold him as she did before the accident. He now plays T-ball and is often upset because Kelli cannot play pitch and catch with him. We find that the sum of $15,000.00 will fairly compensate Dillon for his loss of consortium with Kelli.

### Disposition

For the foregoing reasons, the judgment of the trial court granting the JNOV is affirmed, and Mitsubishi's writ application is granted. The general and special damage awards set forth herein are awarded to the Lawsons. All costs of this

proceeding are assessed to Mitsubishi Motors North America and Tokio Fire and Marine Insurance.

**WRIT GRANTED; AFFIRMED; AND RENDERED**.