938 So.2d 35 (2006)
Kevin D. LAWSON, et al.
v.
MITSUBISHI MOTOR SALES OF AMERICA, INC., et al.
No. 2005-CC-0257.
Supreme Court of Louisiana.
September 6, 2006.
*36 McCranie, Sistrunk, Anzelmo, Hardy, Maxwell & McDaniel, Keith W. McDaniel, Lance B. Williams, Metairie, Brady M. Fitzsimmons; Tony Clayton Law Firm, Antonio M. Clayton, for applicant.
Scofield, Gerard, Veron, Singletary & Pohorelsky, John B. Scofield, Lake Charles; The Townsley Law Firm, Rex D. Townsley, Todd A. Townsley, Marcus P. LaCombe, Lake Charles, for respondent.
Isaac Harrington, Nancy Jane Marshall, New Orleans, for Amicus Curiae, Product Liability Advisory Council Inc.
JOHNSON, J.[*]
We granted certiorari in this products liability case in order to determine whether the appellate court properly affirmed the trial court's grant of a judgment notwithstanding the verdict ("JNOV"). After a two week jury trial, a unanimous verdict was returned in favor of Defendants; however, the trial court granted Plaintiffs' Motion for a Judgment Notwithstanding the Verdict on the issue of Defendants' liability. Further, the trial court sua sponte conditionally ordered a new trial on the issue of liability, providing that the JNOV was reversed on appeal. With respect to the issue of damages, the trial court denied Plaintiffs' motion for JNOV, yet the trial court sua sponte ordered a new trial on the issues of causation and damages. On appeal, the appellate court affirmed the JNOV regarding liability; however, the court of appeal reversed the trial court's denial of JNOV with respect to the issue of damages. Further, the appellate court rendered judgment in favor of Plaintiffs and awarded damages in excess of *37 $1,000,000.00. Defendants aver that the lower courts improperly granted the JNOV in the case at hand, as Defendants assert that the evidence did not over-whelmingly support Plaintiffs' claim of liability on the part of Defendants.
Intertwined with the granting/affirmation of the JNOV is the lower courts' application of the doctrine of res ipsa loquitur. Defendants contend that this evidentiary doctrine was misapplied by the lower courts, and as such, Defendants argue that the doctrine became an incontrovertible conclusion of Defendants' liability. We agree that the lower courts improperly applied the doctrine of res ipsa loquitur, and as such, the doctrine became dispositive in this matter. Furthermore, the implementation of a JNOV was inappropriate, as the evidence was not so strongly in Plaintiffs' favor that reasonable jurors could not have reached a different verdict. For the reasons that follow, we reverse the rulings of the lower courts, we vacate the award of damages, and we reinstate the jury verdict.

FACTS AND PROCEDURAL HISTORY
Kevin and Kelli Lawson ("Plaintiffs") purchased a 1996 Mitsubishi Galant ("1996 Galant") from the J.P. Thibodeaux Mitsubishi dealership ("J.P.Thibodeaux") in Lake Charles, Louisiana, on November 16, 1996. The 1996 Galant had 21,930 miles at the time Plaintiffs purchased the vehicle, as Plaintiffs were purchasing a "program car."[1] The primary driver of the 1996 Galant was Kelli Lawson. Mrs. Lawson routinely used the vehicle to get to and from her workplace and to take care of errands. On January 9, 1999, at approximately 11:00 a.m., Kelli Lawson was planning to use the 1996 Galant to run some errands, and she brought her young son Dillon Lawson along with her. Mrs. Lawson started the vehicle, backed out of her driveway, and then began to drive the vehicle forward. Before she drove away from her family home, as was her usual routine, she stopped the car and blew the horn in order to get her sister's attention. It was customary for Mrs. Lawson to blow the car's horn in order to let her family know that she was leaving or arriving home. When Kelli Lawson honked the horn, the driver's side air bag deployed, and the explosion broke both of her thumbs and injured her right wrist. Dillon Lawson, although frightened because of the air bag's deployment, was not physically injured in this accident because he remained secured in his car seat, which was located in the rear seat of the vehicle.
Immediately after this accident, an ambulance was called, and Kelli Lawson was transported to St. Patrick's Hospital in Lake Charles. Mrs. Lawson was X-rayed at the hospital, and both of her hands were placed in splints; however, Kelli Lawson was not required to stay overnight at the *38 medical facility. On January 11, 1999, Mrs. Lawson visited orthopedic surgeon Dr. Dale Bernauer, and on January 12, 1999, Dr. Bernauer operated (on an out-patient basis) on Mrs. Lawson's right thumb.[2] Because Mrs. Lawson's hands were bandaged and/or in casts for many weeks following the accident, her daily life, including her employment with the Calcasieu Parish Clerk of Court, was disrupted.
On June 10, 1999, Plaintiffs filed this Petition for Damages against Mitsubishi Motor Sales of America, Inc. ("Mitsubishi"), J.P. Thibodeaux, Inc., and Mitsubishi's liability insurer The Tokio Marine and Fire Insurance Company, Limited ("Tokio"). Plaintiffs' petition alleged that Kelli Lawson's injuries were a direct result of the vehicle's defectively manufactured air bag system, as well as the vehicles's inadequate warnings regarding spontaneous air bag deployment. Plaintiffs brought this action pursuant to the provisions of the Louisiana Products Liability Act, LA.REV.STAT. §§ 9:2800.51-.60. On November 9, 2000, J.P. Thibodeaux filed its Motion for Summary Judgment, contending that there was no genuine issue of material fact with respect to its liability for this accident.[3] A hearing on this motion was conducted on May 4, 2001, and the trial court granted said motion and dismissed Plaintiffs' claims against J.P. Thibodeaux without prejudice.
A jury trial was conducted from September 29, 2003, through October 8, 2003, and a twelve-person jury returned a unanimous verdict in favor of Defendants. The jury concluded that the 1996 Galant was not unreasonably dangerous in construction or composition, and further, the jury found that the 1996 Galant was not unreasonably dangerous because of an inadequate warning.[4] On October 21, 2003, the *39 trial court signed the judgment which dismissed Plaintiffs' claims against Defendants Mitsubishi and Tokio with prejudice.
On November 4, 2003, Plaintiffs filed a Motion for a Judgment Notwithstanding the Verdict in accordance with the provisions of LA.CODE CIV. PROC. art. 1811,[5] and this motion was heard on January 6, 2004. On February 26, 2004, the trial court granted Plaintiffs' motion on the issue of liability. Additionally, the trial court sua sponte ordered that a new trial be held (regarding the issue of liability) if the JNOV did not stand. With respect to the *40 issues of causation and damages, the trial court sua sponte ordered a new trial and denied Plaintiffs' motion for JNOV regarding those issues. In the trial court's written reasons for granting the JNOV on the issue of liability, the court explained "that the evidence points so strongly in favor of the Plaintiffs that reasonable men could not reach a different conclusion."[6]
On April 7, 2004, Mitsubishi and Tokio ("Defendants") filed a Petition and Order for Devolutive Appeal or, Alternatively Notice of Intent to File Supervisory Writ. Defendants appealed the JNOV on the issue of liability, and further, Defendants filed a writ application with the appellate court regarding the new trial ordered for the issues of causation and damages and the new trial conditionally ordered on the issue of liability. Meanwhile, on April 20, 2004, Plaintiffs filed a Petition for Devolutive Appeal, as Plaintiffs sought to appeal the trial court's denial of JNOV with respect to damages. The appeals and writ application were consolidated by the Third Circuit Court of Appeal, and on December 29, 2004, the appellate court affirmed the JNOV in addition to rendering judgment in favor of Plaintiffs on the issues of causation and damages. The Third Circuit awarded Plaintiffs $1,022,856.31 in damages. Defendants sought supervisory writs with this Court, and Defendants' writ application was granted on April 29, 2005.[7]

DISCUSSION
A products liability claim is, by its own nature, extremely "fact-intensive," and as such, the heart of Plaintiffs' claim lies with the sufficiency of the evidence submitted at trial. During the two week jury trial in this matter, a great deal of evidence was adduced by both Plaintiffs and Defendants with respect to the 1996 Galant and its air bag system.[8] The jury verdict suggests that Plaintiffs had not carried their burden of proof; however, the trial court disagreed and found that the evidence overwhelmingly favored Plaintiffs' position. While the appellate court agreed with the trial court's determination, we cannot say that the jury was wrong in its conclusion that Defendants were not liable for the accident at hand.
Immediately following the accident, Plaintiffs did not contact J.P. Thibodeaux (where they purchased the vehicle), nor did they contact Mitsubishi Motor Sales of America, Inc.[9] On January 13, 1999, Plaintiffs hired Robert H. Ware (tendered at trial as a "body shop expert") to inspect the 1996 Galant, which was still located at Plaintiffs' home. Mr. Ware was hired to determine whether the vehicle had been in a previous collision, and also, to confirm that the vehicle had not been in a collision at the time the driver's side air bag deployed. At the time of his first inspection, Mr. Ware noted that the vehicle had 47,631 miles on its odometer, and further, Mr. Ware determined that the vehicle had never been in a collision.[10]
On February 4, 1999, Plaintiffs employed the services of Gerald Carpenter *41 and his son Greg Carpenter (both tendered at trial as experts "in the field of electrical automotive mechanics and air bag replacement"). The 1996 Galant was brought to the Carpenters' automotive shop, and at that point, the air bag system was disassembled by Greg Carpenter for further inspection. Because only one of the two front air bags deployed, and because the deployment occurred after Mrs. Lawson blew the car's horn, the Carpenters opined that a malfunction occurred in the "clock spring." Because of the way supplemental restraint systems are electrically designed, it is highly unusual for only one air bag to deploy.
At trial, it was adduced that the air bag system, also known as the supplemental restraint system ("SRS"), is controlled through the use of a clock spring mechanism. This type of mechanism  in fact, this type of supplemental restraint system  is not unique to Mitsubishi, as clock springs are widely used by the automotive industry in the manufacture of many different makes and models of vehicles. The clock spring is responsible for delivering the electrical current needed to ultimately activate the air bag.
A clock spring encapsulates sets of bundled wires, which wires are necessary to complete circuits for items such as the air bag and the horn. In the 1996 Galant, the clock spring was positioned within the steering column, underneath the air bag module. The clock spring protects necessary circuitry from becoming twisted and broken as the steering wheel is turned. As the appellate court explained:
A clockspring is a device which bundles together electrical wires for automotive equipment that is controlled from the steering wheel, e.g., cruise controls, blinkers, and radios. It is installed in the steering column under the horn and looks similar to an octopus: it has a round central portion from which independent insulated bundles of wires extend like tentacles. This construction maintains the integrity of the electrical wires and prevents loss of contact in the electrical circuits when the steering wheel is turned.[11]
After the clock spring was removed from the car, the Carpenters tested the device with an ohmmeter (to determine whether the electrical circuits were functioning), and they detected a short circuit in the clock spring.[12] After detecting the short circuit, the Carpenters performed no further diagnostic testing on the clock spring.[13] Both Gerald and Greg Carpenter *42 suggested that, until Greg Carpenter disassembled the components of the air bag system, the clock spring had not been accessed since the time of its installation during the car's manufacture. However, Greg Carpenter was not prepared to unequivocally state that no one had accessed the clock spring until the removal of said device. Further, the position of the clock spring (relative to all other components comprising the steering column) was not marked before the device was removed from the steering column.
After Defendants became aware of Plaintiffs' lawsuit, further diagnostic testing was performed on the clock spring. Through X-ray analysis, Defendants determined that some of the wiring in the clock spring was, in fact, broken. Plaintiffs' expert William Rosenbluth ("Rosenbluth") (tendered at trial as an "expert in forensic analysis electronics and computer controls in vehicles and an air bag expert") believed that the clock spring malfunctioned as a direct result of its misalignment at the factory. Rosenbluth stated that a misalignment of the clock spring could result in the device's circuitry being over-stressed as the steering wheel is turned, and as such, the wires could break. Further, Rosenbluth suggested that Defendants were aware of the possibility of such misalignments, and resulting malfunctions, due to a "Technical Service Bulletin" ("TSB") issued by Mitsubishi in February 1997.[14] Rosenbluth speculated that a short circuit, resulting from the broken wiring, sent an electrical current to the "squib"[15] which detonated only the driver's side air bag.
Defendants acknowledged that the air bag system malfunctioned; however, Defendants maintain that a "malfunction" is not equivalent to a "manufacturing defect." Defendants' expert Michael Klima ("Klima") (tendered at trial as an "expert in mechanical engineering with specialization in auto design, manufacture, and SRS") opined that the removal of the clock spring by Gerald and Greg Carpenter, without first marking the position of said clock spring, forestalled Plaintiffs' and/or Defendants' ability to accurately determine whether the clock spring was misaligned at the factory during the vehicle's assembly. Further, because Klima had past experience writing TSBs, he suggested that TSBs merely guide technicians in the diagnoses of various problems within automobile systems. Klima asserted that the 1997 TSB issued by Mitsubishi did not indicate that there was a manufacturing defect/manufacturing problem with the clock spring (as the TSB was not addressed to the particular plant where this vehicle was built nor was the TSB exclusively addressed to Mitsubishi Galants), but rather, Klima argued that this TSB helped technicians effectively troubleshoot *43 potential problems with the SRS in various Mitsubishi models, including the Galant.
Ultimately, this has been the only documented case of an air bag spontaneously deploying in a Mitsubishi vehicle. Neither Plaintiffs' experts nor Defendants' experts have been able to "pinpoint" the exact cause of the air bag's deployment. While Defendants agree that the air bag system malfunctioned, Defendants maintain that such a malfunction was not the result of defective manufacturing and/or improper installation. Defendants point out that this vehicle was in the hands of a rental car company for approximately 21,000 miles, and further, Defendants note that Plaintiffs drove this vehicle for an additional 26,000 miles before this accident occurred.[16] Defendants suggest that a manufacturing defect would have presented itself much earlier than January 9, 1999, because the car was thoroughly tested before it left the Mitsubishi factory and because a misaligned clock spring (which is continually rotating as the steering wheel is turned) would have broken long before 47,631 miles were logged on the odometer. Additionally, Defendants suggest that Plaintiffs were aware that the supplemental restraint system was malfunctioning, as the SRS warning light (on the dashboard) was illuminated for approximately 7,737 minutes (approximately 128 hours).[17] However, Plaintiffs contend that there is no other explanation for such an unusual and unprecedented accident, except for Defendants' defective manufacture and/or defective installation of the clock spring mechanism.[18] Thus, Plaintiffs argue that the doctrine of res ipsa loquitur is applicable to the case at hand.

A. RES IPSA LOQUITUR
It is well settled that res ipsa loquitur, Latin for "the thing speaks for itself," is an evidentiary doctrine utilized when there has been a highly unusual act/occurrence; there is no direct evidence to suggest that a defendant's negligence brought about said act/occurrence; and yet, the circumstances surrounding the anomalous event (coupled with the defendant's connection to the unusual act/occurrence) allow the finder of fact to conclude *44 that the defendant was negligent.[19] In Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La. 1989), this Court stated:
The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses. The doctrine allows an inference of negligence to arise from the common experience of the factfinder that such accidents normally do not occur in the absence of negligence.
Additionally, the doctrine does not dispense with the rule that negligence must be proved. It simply gives the plaintiff the right to place on the scales, "along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence" sufficient to shift the burden of proof.
The doctrine applies only when the facts of the controversy "suggest negligence of the defendant, rather than some other factor, as the most plausible explanation of the accident. Application of the principle is defeated if an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence." The doctrine does not apply if direct evidence sufficiently explains the injury.[20]
In the earlier case of Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389 (1957), this Court found:
A determination of a proper instance for application of the principle of res ipsa loquitur has been the subject of volumes of discussion by learned jurists and legal scholars, who have been at pains to point out that the maxim means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that the rule rests for its justification upon the common experience that accidents from such causes do not commonly occur in the absence of neglignece [sic]; and that it is the lack of direct evidence indicating negligence on the part of the defendant as the responsible human cause of particular accident which actually furnishes the occasion and necessity for invoking the rule in its strict and distinctive sense. It is generally conceded that res ipsa loquitur in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage. When all the evidence is in, the question is still whether the preponderance is with the plaintiff. All that is meant by res ipsa loquitur is `that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on *45 the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty.'[21]
Before the parties presented their opening statements, Plaintiffs argued that the instant case was a "textbook example" of the type of case in which the doctrine of res ipsa loquitur should apply. Defendants argued that the application of res ipsa loquitur in this case would be inappropriate, as Defendants maintained that Plaintiffs had the burden of proving "that the only reasonable explanation is a defect, and they have to disprove all other reasonable explanations for this [accident]."[22] Defendants remarked that res ipsa loquitur has been used in past products liability cases, but only "sparingly" and only when the plaintiff has excluded other "reasonable explanations" for an accident. After considering the parties' respective concerns regarding the use of res ipsa loquitur in the instant trial, the trial court decided to preclude Plaintiffs' discussion of the doctrine during their opening statement (and during Plaintiffs' case-in-chief); however, the trial court ultimately decided to instruct the jury on the doctrine of res ipsa loquitur prior to the jury's deliberations. In this instruction to the jury, the trial court stated:
In the ordinary case, the mere fact that the plaintiff may have suffered harm does not furnish evidence that it was caused by anyone's fault, and the plaintiff must introduce other evidence of some fault on the part of the defendant. In a few exceptional cases, the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the fault of the person having control of the thing which caused the injury. This inference may be drawn because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendants' duty. This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probably than not, his injury was caused by the fault of the defendant. If you believe from the fact of the accident itself and from the other evidence offered by the plaintiff that the defendant's fault is the most plausible explanation for the harm which the plaintiff may have suffered, you may return a verdict for the plaintiff. If, on the other hand, you are not convinced by the plaintiff's evidence that it was the defendant's fault rather than some other cause which is the most plausible explanation, then you must return a verdict for the defendant.[23]
In the memorandum supporting Plaintiffs' Motion for a Judgment Notwithstanding the Verdict, Plaintiffs asserted that "the jury ignored, or did not understand, *46 the res ipsa loquitur instruction."[24] Plaintiffs suggested that the trial court's preclusion of their discussion of res ipsa loquitur throughout the trial severely handicapped their case-in-chief, as it is Plaintiffs' contention that said doctrine is inextricably woven into their products liability claim. The trial court agreed with the Plaintiffs, stating in pertinent part:
The defense suggested to the jury several factors that could have contributed to the deployment of the airbag. However, the Plaintiffs refuted these suggestions in their case-in-chief by competent evidence. The burden then shifted to the Defendants to show the absence of negligence. In the Defendants' case-in-chief, no evidence establishing other plausible causes was produced to the jury. Counsel for the Defendants refuted their clients' possible liability but did not produce evidence of the alternate liability to absolve them completely of negligence.
This Court instructed the jury on the doctrine of res ipsa loquitur despite objection from the defendant. The jury was instructed on the doctrine, they evaluated the evidence in deliberation, apparently ignoring the law, and they returned a verdict for the Defendants.[25]
Upon appellate review, the Third Circuit Court of Appeal stated:
Mitsubishi urges that the trial court improperly applied the doctrine of res ipsa loquitur, noting that the doctrine allows, but does not require, an inference of negligence. In our view, Mitsubishi's argument is simply another attack on the trial court's grant of the motion for JNOV. The trial court determined that the facts of this case warranted application of the doctrine and that through application of the doctrine the Lawsons proved by a preponderance of the evidence that the Galant contained a defect. Consequently, the trial court concluded that the jury ignored its instruction on the doctrine of res ipsa loquitur and that its failure to apply the doctrine in this case was unreasonable.[26]
Before proceeding with our analysis, we must make a determination regarding the propriety of using the doctrine of res ipsa loquitur in the context of a products liability action. The Louisiana Products Liability Act (LA.REV.STAT. §§ 9:2800.51-.60), which became effective on September 1, 1988, "establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter."[27] LA.REV.STAT. § 9:2800.54 provides:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

*47 (2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
Thus, a plaintiff must prove that a product is unreasonably dangerous in order to prevail in a products liability action. The question then becomes  can a plaintiff utilize the doctrine of res ipsa loquitur (traditionally utilized in order to establish negligence on the part of a defendant) in order to establish that a product is unreasonably dangerous, and thus, defective? Some courts in Louisiana have answered the above question in the affirmative.
In State Farm Mutual Automobile Insurance Co. v. Wrap-On Company, Inc., 626 So.2d 874 (La.App. 3 Cir.1993), the Third Circuit Court of Appeal stated:
Heretofore, res ipsa loquitur has been used predominantly in negligence cases. An argument may be made that, as the Act is not based wholly on negligence theory, the doctrine has no application to claims brought under it. On the contrary, we believe that because it is an evidentiary doctrine, it may be applied to any theory of recovery for which it is suitable. The Act does not distinguish what is acceptable evidence; it only requires that certain elements of certain theories be proved. Moreover, because application of the doctrine only gives rise to a permissible inference of liability, it does not mandate that liability be found. Larkin, supra.

In fact, the Louisiana Supreme Court has previously applied res ipsa loquitur in a products liability case. In Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971), plaintiff alleged that a brand of cattle dip was defective and caused the death of his cattle. He sued the manufacturer of the dip. The trial court found the dip was defective because it contained too much arsenic. The court of appeal reversed, but the supreme court reinstated the trial court's judgment and held that plaintiff proved his claim solely by showing that the dip was the most probable cause of the damages.
While the court in Weber never specifically stated that it was utilizing res ipsa loquitur, it applied the doctrine in effect. It stated that plaintiff's burden of proof by a preponderance of the evidence, may be met by either direct or circumstantial evidence and that, if circumstantial evidence is used, it must exclude other reasonable hypotheses with a fair amount of certainty. It is not necessary to negate all possible causes. This application-in-fact of res ipsa loquitur to a products liability case indicates that the doctrine is not limited to negligence cases nor does it require the use of its Latin title-like some talismanic incantation-to *48 be effective.[28]
In Jurls v. Ford Motor Company, 32,125 (La.App. 2 Cir. 1/6/00); 752 So.2d 260, the Second Circuit Court of Appeal stated:
We cannot infer the existence of a defect solely from the fact that an accident occurred. Ashley [v. General Motors Corp., 27,851 (La.App. 2d Cir. 1/24/96), 666 So.2d 1320], supra. However, a manufacturing defect may be established by circumstantial evidence under the evidentiary doctrine of res ipsa loquitur. Kampen v. American Isuzu Motors, Inc., 119 F.3d 1193 (5th Cir. 1997), vacated on other grounds, 157 F.3d 306 (5th 1998); Williams v. Emerson Elec. Co., 909 F.Supp. 395 (M.D.La. 1995); Randolph v. General Motors Corp., 93 1983 (La.App. 1st Cir.11/10/94), 646 So.2d 1019), writ denied, 95-0194 (La.3/17/95), 651 So.2d 276; State Farm Mut. Auto. Ins. Co. v. Wrap-On Co., Inc., 626 So.2d 874 (La.App. 3rd Cir. 1993), writ denied, 93-2988 (La.1/28/94), 630 So.2d 800. The res ipsa loquitur doctrine means that the circumstances surrounding an accident are so unusual as to give rise to an inference of negligence or liability on the part of the defendant. Under such circumstances, the only reasonable and fair conclusion is that the accident resulted from a breach of duty or omission on the part of the defendant. State Farm, supra. Jurisprudence has relaxed the exclusive control element associated with res ipsa loquitur. Williams, supra; Spott v. Otis Elevator Co., 601 So.2d 1355 (La. 1992); State Farm, supra; Lucas v. St. Frances Cabrini Hospital, 562 So.2d 999 (La.App. 3d Cir.1990), writ denied, 567 So.2d 101, 567 So.2d 103 (La.1990).[29]
The United States District Court for the Middle District of Louisiana has also weighed in on the issue of using res ipsa loquitur in a products liability case. In Williams v. Emerson Electric Co., 909 F.Supp. 395 (M.D.La.1995), the federal court stated:
. . . the modern-day res ipsa loquitur doctrine in Louisiana more directly implicates the weight accorded to circumstantial evidence. Where "the circumstances involved in an accident are of such an unusual character" as to justify an inference of liability, Wrap-On, 626 So.2d at 876 (quoting Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389, 391 (1957)), the plaintiff may, at the close of the evidence, rely on the doctrine to prove an essential element of his case. The doctrine does not create a cause of action; its purpose is evidentiary. Its application, as an evidentiary device, is not limited to negligence cases in Louisiana. As the Wrap-On court observed, the LPLA sets forth the substantive law; it says nothing about how a plaintiff must prove his case. Id. at 877. Under res ipsa loquitur, the circumstantial evidence presented "must exclude other reasonable hypotheses with a fair amount of certainty. It is not necessary to negate all possible causes." Id.[30]
Regarding the use of res ipsa loquitur in the realm of strict liability actions, Professor Frank L. Maraist and Dean Thomas C. Galligan, Jr. make the following comments:
There is a certain amount of perhaps meaningless debate over whether res ipsa loquitur applies in strict product liability cases. Technically it does not, because the original meaning of res ipsa *49 is that in the existing circumstances, the most logical inference is that the defendant's negligence caused the victim's injuries. However, in strict product liability cases, particularly those based upon defective manufacture, the circumstances sometimes establish that defective manufacture was the most probable cause of the victim's injuries. In such cases, there is a jury question of defective manufacture and it is irrelevant whether the term res ipsa is used. In fact, at least one court has applied res ipsa in a case arising under the Louisiana Product Liability Law.[31]
Traditionally, the evidentiary doctrine of res ipsa loquitur has been used in tort actions to establish negligence on the part of a defendant; however, we conclude that this evidentiary doctrine may also be utilized in the context of a products liability action. We see no reason why a plaintiff cannot use circumstantial evidence in order to make the inference that a product was unreasonably dangerous when that product left a manufacturer's control. This inference merely shifts the burden of proof to the defendant-manufacturer, such that the manufacturer must prove that the product was not defective when it left the manufacturer's control. The defective nature of a product will not be "presumed" by utilizing this doctrine, but rather, "[i]t simply gives the plaintiff the right to place on the scales, `along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of [the unreasonably dangerous nature of a product]' sufficient to shift the burden of proof."[32] While we find that the doctrine of res ipsa loquitur is applicable to products liability actions, we do not agree with the lower courts' application of the doctrine in the instant case.
At first blush, because of the highly unusual nature of Mrs. Lawson's accident, it appears as if the instant case is exactly the type of case contemplated by the doctrine of res ipsa loquitur. As the appellate court aptly noted:
A plaintiff's burden of proof in a civil suit is generally preponderance of the evidence. He can satisfy his burden of proof with direct or circumstantial evidence. Sonnier v. Bayou State Mobile Homes, Inc., 96-1458 (La.App. 3 Cir. 4/2/97), 692 So.2d 698, writ denied, 97-1575 (La.10/3/97), 701 So.2d 201. Circumstantial evidence is "evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred." W. Page Keeton, et al., Prosser & Keeton on the Law of Torts § 39, at 242 (5th ed.1984). When direct evidence of a defendant's negligence is not available, the doctrine of res ipsa loquitur assists the plaintiff in presenting a prima facie case of negligence. Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr., 564 So.2d 654 (La.1989). Res ipsa loquitur is applicable when the circumstances surrounding an accident are so unusual as to give rise to an inference of negligence or liability on the part of the defendant and that, under such circumstances, the only reasonable and fair conclusion is that the accident resulted from a breach of duty or omission on the part of the defendant. Id.

*50 If applicable, the doctrine allows the trier of fact to infer negligence from the circumstances of the event. Id. Generally, three criteria must be present for the doctrine to be applicable: 1) the facts must indicate that the plaintiff's injuries would not have occurred in the absence of negligence; 2) the plaintiff must establish that the defendant's negligence falls within his scope of duty to plaintiff; and 3) the evidence should sufficiently exclude inference of the plaintiff's own responsibility or the responsibility of others besides defendant in causing the accident. Id. Because the standard of proof is preponderance of the evidence, not proof beyond a reasonable doubt, the plaintiff's evidence need only exclude all other reasonable explanations for his injuries; it need not "conclusively exclude all other possible explanations for his injuries" Id. at 664.[33]
Clearly, a car manufacturer has a duty to the consumer to provide a safe vehicle, including a properly functioning supplemental restraint system. Mrs. Lawson's supplemental restraint system malfunctioned, and the spontaneous deployment of the air bag was an obvious aberration. However, for res ipsa loquitur to apply in the instant matter, Plaintiffs need to "sufficiently exclude inference of the plaintiff's own responsibility or the responsibility of others besides defendant in causing the accident."[34]
The key question is  why did the clock spring malfunction? Plaintiffs' expert William Rosenbluth testified:
Q. Now, Bill, why did this air bag  why did the clock spring to the air bag malfunction?
A. Because it was misaligned at the factory when Mitsubishi built or assembled the car.
Q. So that answers where it was misaligned?
A. That is where it started. That is where it was misaligned, yes.[35]
Rosenbluth's opinion, however, cannot be verified with direct evidence because Plaintiffs' experts Gerald and Greg Carpenter removed the clock spring (some four (4) months before Defendants knew about this accident) without first marking the device's position, thereby making it impossible for anyone to know if the clock spring was misaligned at the time of the accident. Defendants' expert Michael Klima testified:
Q. In terms of your analysis in the case have you drawn a conclusion that there was a manufacturing defect in this vehicle that existed when it left the Normal, Illinois plant?
A. I don't. I don't feel that that conclusion can be drawn because we have that gap in the handling of the physical evidence. I would not feel comfortable with the basis we have to come to that conclusion.[36]
. . .
Q. And in terms of Mr. Rosenbluth's testimony about a potential misalignment at the factory, it would be your experience, if that were the case, there would have been a failure, there would have *51 been a light on much earlier than 47,000 miles?
A. Well, and especially if it was the two-loop or three-loop misalignment. Then, at the assembly plant when they did the test drive where they went full stop right steer and full stop left steer, that would have broken it, if it was misaligned to that extent, and the light would have gone on at that point, and they would have had to put a new clock spring in before it could have even left the assembly plant grounds.[37]
Was this accident the result of a manufacturing defect, as defined by the Louisiana Products Liability Act? Was the clock spring misaligned at the factory (i.e., defectively installed)? Or, could a misalignment have occurred if the air bag system was accessed by a third party (perhaps a previous owner) in an effort to repair something within the steering column? No one knows for sure. None of the experts knows the cause of the clock spring's malfunction. Further, there are no service records from the Plaintiffs, and the instant record contains no information regarding the vehicle's maintenance during its ownership by the rental car company. Had the Plaintiffs' experts not tampered with the positioning of the clock spring, direct evidence would have been available to prove or disprove the Plaintiffs' theory of misalignment. We do not believe that the Plaintiffs should be able to take advantage of the doctrine of res ipsa loquitur, since direct evidence of a possible misalignment was available prior to Plaintiffs' disassembly of the supplemental restraint system. Additionally, Plaintiffs did not adequately address the probability that a previous owner had accessed, and therefore misaligned, the clock spring mechanism. Plaintiffs' expert Greg Carpenter testified:
Q. Do you recall giving a deposition in this case?
A. Yes, sir.
Q. Do you recall saying that you couldn't put your hand on a Bible and say that no one else had been in there?
A. I don't know anybody that could say that.
Q. So, the truth of the matter is you're not willing to swear in front of this jury that you can, based upon your examination, that no one else had gone in there?
A. Not in this lifetime.
Q. Because isn't it true, sir, that you testified that coming up under your dad, that if you or your dad had made the repair, you wouldn't be able to tell that you had gone in before?
A. That's right.[38]
Accordingly, the use of the doctrine of res ipsa loquitur is inappropriate in this case.[39]

B. JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV)
As discussed earlier, LA.CODE CIV. PROC. art. 1811 provides the procedural guidelines for those parties wanting to obtain a judgment notwithstanding the verdict. However, the procedural guidelines do not specify which elements are required in order for such a judgment to be granted. In Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00); 774 So.2d 84, this Court set *52 forth the requirements incumbent upon a court granting JNOV. This Court stated:
La.Code of Civil Procedure art. 1811(F) is the authority for a JNOV. This article provides that a motion for judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both. The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:

A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Smith v. Davill Petroleum Company, Inc. d/b/a/ Piggly Wiggly, 97-1596 (La.App. 1 Cir. 12/9/98), 744 So.2d 23. See also Powell v. RTA, 96-0715 (La.6/18/97), 695 So.2d 1326; Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991); State of Louisiana, DOTD v. Scramuzza, 95-786 (La.App. 5 Cir. 4/3/96), 673 So.2d 1249; Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700; Engolia v. Allain, 625 So.2d 723, 728 (La.App. 1 Cir.1993); Adams v. Security Ins. Co. Of Hartford, 543 So.2d 480, 486 (La.1989).[40]
When the trial court granted Plaintiffs' Motion for a Judgment Notwithstanding the Verdict, the trial court stated:
This Court is of the opinion that the evidence points so strongly in favor of the Plaintiffs that reasonable men could not reach a different conclusion. In this case, Plaintiffs proved through competent evidence that, more probable than not, the clockspring was misaligned at the time of manufacture, and this was the most plausible explanation for this highly unusual accident.[41]
On appeal, the appellate court found:
Our review of the evidence reveals that the trial court properly applied the doctrine of res ipsa loquitur to the facts herein and properly granted the motion for JNOV. It is clear that Kelli's injuries would not have occurred in the absence of negligence and that installation of a properly aligned clockspring in the Galant is within Mitsubishi's scope of duty to the Lawsons. The evidence excludes any reasonable inference of anything other than misalignment of the clockspring causing Kelli's air bag to deploy and establishes that this misalignment, more probably than not, occurred during the manufacturing process. There is no evidence that anything other than the clockspring caused the air bag to deploy as it did, and there is no reasonable inference that anything occurred after the manufacturing process which would have caused the air bag to deploy as it did. Therefore, we agree with the trial court that the only conclusion reasonable men could reach in this case is that *53 Kelli's injuries were caused by a manufacturing defect in the Galant.[42]
Both of the lower courts were wrong in their respective conclusions that "reasonable men could not reach a different conclusion" with respect to Defendants' liability for Mrs. Lawson's accident. In our opinion, the doctrine of res ipsa loquitur was misapplied by the trial court in its determination that JNOV should be granted, and as such, the doctrine became dispositive of the issue of Defendants' negligence. Once Defendants' negligence was established through the misapplication of res ipsa loquitur, it is presupposed that the jury's verdict could not stand, as the jury concluded that Defendants were not liable for Mrs. Lawson's accident. The only reason JNOV could be granted in the instant case is because the doctrine of res ipsa loquitur was erroneously applied, thereby creating a situation in which the evidence did "point so strongly and overwhelmingly in favor of" Plaintiffs.[43] Accordingly, we find that JNOV should not have been granted in this matter.
Because the trial court sua sponte ordered a new trial in the event the JNOV was reversed on appeal, we must discuss whether the trial court erred in ordering this new trial. This Court recently resolved the issue of whether a trial court sua sponte may grant a new trial when a party has moved for JNOV only. In Horton v. Mayeaux, 05-1704 (La.5/30/06); 931 So.2d 338, this Court found:
Our finding that a district court retains the authority to order a new trial on its own motion, even after the expiration of the delay for filing a motion for new trial, in cases in which one of the parties has filed either a motion for new trial or a motion for JNOV, is consistent with the language of La.Code of Civ. Proc. 1811(B), relative to motions for JNOV, which provides as follows:
If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict. If no verdict was returned, the court may render a judgment or order a new trial.
(Emphasis added.) Thus, the Code of Civil Procedure article governing motions for JNOV specifically authorizes district courts to order a new trial in response to a motion for JNOV. Although La.Code of Civ. Proc. Art. 1811(A)(2) allows parties to join a motion for new trial with a motion for JNOV or to pray for a new trial in the alternative in a motion for JNOV, nothing in subsection (B), quoted above, indicates that a district court is prohibited from ordering a new trial if the party seeking the JNOV fails to join a new trial motion or pray for new trial in the alternative. In fact, the language suggests that the ordering of a new trial is always appropriate in response to a party's filing of a motion for JNOV.[44]
Thus, in the case at hand, the trial court did not err by conditionally ordering a new trial on its own motion, in the event the JNOV was reversed on appeal. However, we must determine whether the trial court had "good grounds"[45] for conditionally ordering said new trial.
*54 In Lamb v. Lamb, 430 So.2d 51 (La. 1983), this Court found:
La.C.C.P. art.1973 provides that the trial court may grant a new trial if there exists good grounds therefor. A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered. Deliberto v. Deliberto, 400 So.2d 1096 (La.App. 1st Cir.1981); Jones v. Ledet, 383 So.2d 1308 (La.App. 3rd Cir.1980); Shows v. Williamson, 256 So.2d 688 (La.App. 2nd Cir.1972); See Hardy v. Kidder, 292 So.2d 575 (La. 1973); Succession of Robinson, 186 La. 389, 172 So. 429 (1936). We have recognized that the court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse. La.C.C.P. art.1971 comment (d); Hardy v. Kidder, 292 So.2d 575 (La.1973); DeFrances v. Gauthier, 220 La. 145, 55 So.2d 896 (La. 1951).[46]
This Court referred to its opinion in Lamb when deciding the case of Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00); 772 So.2d 94. In Joseph, the lower court granted plaintiff's motion for JNOV, while conditionally granting a new trial. As in the case at hand, the Joseph Court reviewed the trial court's grant of JNOV; however, the Court also looked at the trial court's conditional grant of a new trial. The Joseph Court determined:
In the present case, we note that the trial court conditionally granted a new trial if the JNOV was reversed as permitted under La.Code Civ. Proc. art. 1811(C)(1), (2), but did not specify the grounds for granting the motion. As provided in La.Code Civ. Proc. art.1972, a new trial shall be granted, upon contradictory motion, where (1) the verdict or judgment is contrary to the law and evidence; (2) important evidence is obtained after trial; or (3) the jury was either bribed or behaved improperly. Moreover, pursuant to La.Code Civ. Proc. art.1973, a new trial may be granted if there is good ground therefor except as otherwise provided by law.

In Lamb v. Lamb, 430 So.2d 51 (La. 1983), we set forth the standard for granting a new trial pursuant to La. Code Civ. Proc. art.1973. There we stated:

A proper application of this article necessitates an examination of the facts and circumstances of the individual case. When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered.. . . We have recognized that the [trial] court has much discretion regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse. Lamb, 430 So.2d at 53.
In a motion for new trial under either La.Code Civ. Proc. arts.1972 or 1973, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable *55 witness. Smith v. American Indem. Ins. Co., 598 So.2d 486 (La.App. 2 Cir.), writ denied, 600 So.2d 685 (La.1992). The applicable standard of review in such matter is whether the trial court abused its discretion. Anthony v. Davis Lumber, 629 So.2d 329 (La.1993).
As we stated at the outset of this discussion, the trial court did not specify any grounds for its decision to conditionally grant the motion for new trial. In stark contrast to the procedure employed by the trial court, we point out that La. Code Civ. Proc. art. 1811(C)(1) mandates that the trial court specify the grounds which support its action. The evident purpose of Article 1811's requirement for specifically stated grounds for the trial court's action on the motion for new trial is to provide a reviewing court with particularized reasons with which to assess the propriety of the motion; to require anything less relegates the reviewing court to speculation. A conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur.[47]
Thus, it is incumbent upon us to carefully review the trial court's reasons for granting a new trial in order to ascertain whether "there [were] good [grounds] therefor."[48]
In its "Judgment and Reasons," the trial court stated:
This Court will also grant a new trial as to the issues of causation and damages. If the JNOV on liability is vacated or reversed on appellate review, a new trial is alternatively granted as to that issue.
The motion for new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Whether to grant a new trial requires a discretionary balancing of many factors. Unlike the standard applicable to a motion for JNOV, the trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Furthermore, the Louisiana Supreme Court has held that "when the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered."[49]
While the trial court reiterated the law with respect to the discretionary authority of trial courts to order new trials, we are unable to glean from the "Judgment and Reasons" any "good grounds"[50] for the ordering of a new trial in the instant matter. Furthermore, after a thorough review of the entire record before us  including a thorough review of the trial transcripts  we are unable to extract any "good ground"[51] upon which to base the ordering of a new trial. It does not appear from the instant record that the jury's verdict "would [have resulted] in a miscarriage of justice,"[52] and thus, the trial court abused its wide discretionary *56 authority and erred in ordering this new trial.

CONCLUSION
There is no question that Kelli Lawson was badly injured in this extremely unusual accident. However, while it is natural to want to make whole the injured individual, sometimes it is not possible to do so because what has occurred is an accident for which no one is liable. Unfortunately, Plaintiffs' experts removed the clock spring from the vehicle without first marking its position, thereby tampering (however inadvertently) with direct evidence of a possible manufacturing defect (i.e., a possible misalignment of the clock spring). Further, Defendants did advance evidence, through the testimony of Plaintiffs' own expert, that the clock spring mechanism could have been accessed by a third party, thus calling into question whether Defendants misaligned the clock spring. For the foregoing reasons, we find that the jury's verdict was reasonable in light of the evidence adduced at trial, and as such, the trial court misapplied the doctrine of res ipsa loquitur and erroneously granted Plaintiffs' Motion for a Judgment Notwithstanding the Verdict. The court of appeal erred in its affirmation of the JNOV, and further, the appellate court erroneously rendered judgment in favor of Plaintiffs on the issues of causation and damages. Plaintiffs are not entitled to JNOV, nor are they entitled to a new trial. Therefore, we reverse the appellate court's decision, and we reinstate the jury's verdict.
REVERSED; JURY VERDICT REINSTATED.
VICTORY, J., concurs in the result.
TRAYLOR, concurs and assigns reasons.
KNOLL, J., dissents and assigns reasons.
TRAYLOR, J., Concurring.
I agree with the majority that the Court of Appeal decision should be reversed and the jury verdict reinstated; however, I disagree with the majority's conclusion that the doctrine of res ipsa loquitur, a negligence concept, is applicable in a products liability case.
KNOLL, Justice, dissents.
In my view, the majority errs in finding res ipsa loquitur is not applicable to the case sub judice. Res ipsa loquitur is applicable when: (1) the evidence establishes more probably than not the injury was of a kind which ordinarily does not occur in the absence of negligence; (2) the evidence permits the jury to discount other possible causes and to conclude it was more likely than not that the defendant's negligence caused the injury; and (3) the defendant's negligence falls within the scope of his duty to the plaintiff. Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr., 564 So.2d 654, 666 (La.1989). As then Chief Justice Fournet observed, and the majority takes cognizance of:
All that is meant by res ipsa loquitur is `that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty.'

*57 Larkin v. State Farm Mut. Auto. Ins. Co., 233 La. 544, 552, 97 So.2d 389, 391-392 (1957) (citations omitted).
Given the highly unusual circumstances of this accident, I find the doctrine of res ipsa loquitur was properly applied by the courts below.
It cannot be ignored that it is highly unusual for one air bag to deploy merely because the driver blew the horn of the vehicle. The record indicates that under normal circumstances both air bags deploy. Mitsubishi's own expert inspected the vehicle and found nothing consistent with it having been in a collision that would have caused the driver side air bag to deploy. Furthermore, this expert testified that X rays of the clockspring revealed "a disruption" in the wiring and that the clockspring "did not perform correctly."
Contrary to the majority, I find the evidence sufficiently excludes inference of the plaintiff's own responsibility or the responsibility of others besides the defendant. Although plaintiffs' experts, Gerald and Greg Carpenter, removed the clockspring without first marking the device's position, the evidence overwhelmingly weighs in favor of finding it was more likely than not Mitsubishi's negligence that caused the injury. Greg Carpenter testified in detail concerning the process that he followed in removing the clockspring, explaining that when he dismantled the steering column he could hear the paint on the steering column screws "pop" as he loosened them. This popping sound indicated to him that the screws had not been removed since the vehicle had left the factory, and he concluded that the steering column had not been opened since it left the manufacturer. Mitsubishi cannot point to any specific repair which would have misaligned the clockspring; it merely speculates that some work may have been performed and that if any repair work was performed it may have misaligned the clockspring. This is not a reasonable inference to defeat the application of res ipsa loquitur.
Mitsubishi theorizes that work was performed on the vehicle which could have caused the clockspring to malfunction. Plaintiffs purchased the vehicle on November 16, 1996 with 21,930 miles on the odometer. The air bag incident occurred more than two years later, after the plaintiffs had driven the vehicle an additional 25,000 miles. Mr. and Mrs. Lawson testified that other than routine oil changes, they did not have any work performed on the vehicle. Additionally, considering that the vehicle had a warranty of five years or 60,000 miles, it is reasonable to conclude that the plaintiffs would have had repairs performed at a dealership for no charge. Therefore, there is no reasonable support for Mitsubishi's theory that plaintiffs had work done to the vehicle which could have caused the clockspring to malfunction. Mr. Rosenbluth, plaintiffs' expert in the forensic analysis of electronic component vehicle controls and failure analysis of air bag systems, testified that he knew of only two things that could have caused a misalignment of the clockspring after it was installed by the factory and there was no evidence that either of these occurred.
The majority justifies its refusal to apply res ipsa loquitur because it finds direct evidence of a "possible misalignment" was available prior to the Carpenters' disassembly of the supplemental restraint system. This in itself is speculative, as plaintiffs' expert opined there was no way to determine the clockspring's initial alignment.
In this case where neither the plaintiff nor Mitsubishi can say with certainty why the clockspring malfunctioned, and where all the evidence is circumstantial, I find the *58 trial court properly applied the doctrine of res ipsa loquitur and properly granted the motion for JNOV. There is no reasonable inference that anything occurred after the vehicle left the manufacturer that would have caused the air bag to deploy from the driver merely blowing the horn. The consumer should not be the party to absorb the risk of this obvious defect.
For these reasons, I respectfully dissent and would affirm the court of appeal decision.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Justice Pro Tempore, sitting for Associate Justice Catherine D. Kimball.
[1] A "program car" is defined as "[a] vehicle that is sold directly to a daily rental company by an automaker under terms set by the manufacturer. Program cars represent a large portion of current model-year vehicles remarketed through auctions." Manheim Auctions, A Guide to Wholesale Vehicle Auctions: Auction Handbook (Glossary of Terms), http: //www.manheimauctions.com/handbook/ glossary/index3.html (last visited February 6, 2006). J.P. Thibodeaux purchased this "program car" from the Baltimore Washington Auction House on or about October 26, 1996, and the subject vehicle arrived at J.P. Thibodeaux on or about November 8, 1996. The Baltimore Washington Auction House had acquired the subject vehicle from Value Rent A Car, Inc., of Boca Raton, Florida. Value Rent A Car, Inc., had obtained said vehicle (brand-new) from Mitsubishi Motor Sales of America, Inc. Thus, the vehicle had been used as a rental car for over 21,000 miles before being purchased by Plaintiffs.
[2] Following Mrs. Lawson's initial surgery, she went to physical therapy five (5) days per week, for approximately six (6) weeks. The cast on Mrs. Lawson's left hand  the hand which required no surgery  was removed about one (1) month after the accident (and her left hand continued to successfully heal); however, she continued to have problems with her right hand and her right wrist.

Kelli Lawson (who was approximately twenty-four (24) years old at the time of the accident) was treated by Dr. Bernauer until June 4, 1999, and then, Mrs. Lawson began seeing Dr. Darrell Henderson, a plastic and reconstructive surgeon specializing in surgeries of the hand and/or wrist. After Mrs. Lawson complained of wrist pain, Dr. Henderson performed surgery on Mrs. Lawson's right wrist on July 6, 1999. This wrist surgery was performed in order to remove a suspected cyst. During surgery, her physician found no cyst, but instead, he found a torn ligament. The physician determined that the torn ligament (and inflammatory tissue resulting therefrom) was a direct result of the accident of January 9, 1999. In January 2001, Dr. Henderson removed a bone spur from the base of Mrs. Lawson's right thumb.
[3] Upon the acquisition of the 1996 Galant, J.P. Thibodeaux merely conducted a standard vehicle inspection (in accordance with industry practices) and did not inspect the vehicle's air bag system.
[4] LA.REV.STAT. § 9:2800.55 provides:

A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.
LA.REV.STAT. § 9:2800.57 provides:
A. A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
B. A manufacturer is not required to provide an adequate warning about his product when:
(1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or
(2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.
C. A manufacturer of a product who, after the product has left his control, acquires knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or who would have acquired such knowledge had he acted as a reasonably prudent manufacturer, is liable for damage caused by his subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.
[5] LA.CODE CIV. PROC. art. 1811 provides:

A.(1) Not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of judgment under Article 1913, a party may move for a judgment notwithstanding the verdict. If a verdict was not returned, a party may move for a judgment notwithstanding the verdict not later than seven days, exclusive of legal holidays, after the jury was discharged.
(2) A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict. If no verdict was returned, the court may render a judgment or order a new trial.
C.(1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
(3) If the motion for a new trial has been conditionally denied and the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.
D. The party whose verdict has been set aside on a motion for a judgment notwithstanding the verdict may move for a new trial pursuant to Articles 1972 and 1973. The motion for a new trial shall be filed no later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of the signing of the judgment notwithstanding the verdict under Article 1913. The motion shall be served pursuant to Articles 1976 and 1314.
E. If the motion for a judgment notwithstanding the verdict is denied, the party who prevailed on that motion may, as appellee, assert grounds entitling him to a new trial in the event the appellate court concludes that the trial court erred in denying the motion for a judgment notwithstanding the verdict. If the appellate court reverses the judgment, nothing in this Article precludes the court from determining that the appellee is entitled to a new trial or from directing the trial court to determine whether a new trial shall be granted.
F. The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues.
[6] Judgment and Reasons (2/26/2004), R. at 1571, vol. 7.
[7] Lawson v. Mitsubishi Motor Sales of America, Inc., 05-0257 (La.4/29/05); 901 So.2d 1044.
[8] A great deal of evidence was also advanced by Plaintiffs and Defendants with regard to Mrs. Lawson's injuries and the impact of said injuries on her daily life.
[9] Defendants were first made aware of this accident when they were served with Plaintiffs' lawsuit.
[10] Mr. Ware examined the vehicle twice  once on January 13, 1999, and a second time on March 1, 2000. Further, Mr. Ware was present on February 4, 1999, when the air bag system was disassembled.
[11] Lawson v. Mitsubishi Motor Sales of America, Inc., 04-839 (La.App. 3 Cir. 12/29/04); 896 So.2d 149, 154.
[12] According to the online encyclopedia Wikipedia, "[a] short circuit (sometimes known as simply a short) is a fault whereby electricity moves through a circuit in an unintended path, usually due to a connection forming where none was expected. This unintended path often has a very low resistance which means that a much larger current than normal flows, potentially causing overheating, fire or explosion." Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/ Short_circuit (last visited Feb. 14, 2006).
[13] All of today's modern vehicles have some type of on-board computer system (and some vehicles have multiple computer systems) which monitors/regulates the car's various components. As such, dealerships and maintenance shops use diagnostic scanning tools which allow technicians to extract codes stored within the vehicle's computer(s). These codes tell technicians the type(s) of problem(s) affecting the car. The Carpenters did not want to "erase" any important computer codes by conducting further diagnostic testing (without Mitsubishi-specific scanning equipment), and therefore, the codes were not extracted from the 1996 Galant until after Defendants were involved in this matter.

By utilizing a Mitsubishi-specific scanning tool during later diagnostic testing, the computer codes revealed that the SRS warning light had been illuminated for approximately 7,737 minutes. Further, the codes revealed some type of "short circuiting" within the clock spring mechanism. These codes, however, did not explain why the air bag spontaneously deployed.
[14] The "Technical Service Bulletin" ("TSB") issued by Mitsubishi in February 1997 (TSB-97-52B-002) addressed a wide variety of Mitsubishi models, including the 1996 Galant. These TSBs are designed for technicians to utilize, as the TSBs are not geared for the "average reader." The TSB in question, however, had the following language with regard to troubleshooting problems with the SRS: "Open-circuit in clock spring due to inappropriate neutral position."
[15] A "squib" is a device composed of chemically reactive materials which, when triggered, will explode. Squibs are used in the SRS design as the actual triggering mechanism for the air bag's deployment.
[16] Plaintiffs were unable to produce any service records and/or maintenance documents for the 1996 Galant during the time frame in which they owned the vehicle. This record contains no documentation regarding the maintenance performed (or not performed) by Value Rent A Car, Inc., while the rental car company owned the vehicle.
[17] The purpose of the SRS warning light is to indicate to the driver that there is a problem with the supplemental restraint system. The 1996 Galant Owners's Manual states that a continuously illuminated SRS warning light means that "the SRS is not working properly, and you should immediately have it inspected by an authorized dealer." MITSUBISHI MOTORS, 1996 GALANT OWNER'S MANUAL (MSSP-017C-96) 43 (1996).

Defendants argue that the SRS warning light was illuminated before the accident, while Plaintiffs contend that they never saw such a warning light. Furthermore, Plaintiffs argue that this light could have been illuminated after said accident.
[18] The clock spring mechanism is assembled by two other companies before Mitsubishi places the device in its vehicle. The first company (Methode) actually constructs the clock spring mechanism, thoroughly checks the device before it is shipped to a second company, and places pins within the device to secure its proper alignment during shipping. The second company (Vuteq) receives the clock spring and attaches the mechanism to a "combination switch." This "combination switch" controls various items that would be located near the steering wheel, such as the turn signal controls, the bright headlight controls, and the windshield wiper controls. The clock spring, with the combination switch attached, is then shipped to Mitsubishi for its installation within a vehicle.
[19] BLACK'S LAW DICTIONARY defines res ipsa loquitur as "[t]he doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence so as to establish a prima facie case." BLACK'S LAW DICTIONARY 608 (2nd Pocket Edition 2001).
[20] Id. at 660 (citations omitted).
[21] Id. at 551-52 (emphasis added) (footnote omitted).
[22] Trial Transcript (9/29/2003), R. at 1618, vol. 7 (alteration in original).
[23] Trial Transcript (10/8/2003), R. at 1436-1437, vol. 6.
[24] Memorandum in Support of Plaintiff's [sic] Motion for a Judgment Notwithstanding the Verdict (11/4/2003), R. at 1471, vol. 6.
[25] Judgment and Reasons (2/26/2004), R. at 1579, vol. 7 (emphasis added).
[26] Lawson v. Mitsubishi Motor Sales of America, Inc., 04-839 (La.App. 3 Cir. 12/29/04); 896 So.2d 149.
[27] LA.REV.STAT. § 9:2800.52 (emphasis added).
[28] Id. at 877.
[29] Id. at 265.
[30] Id. at 398 (footnote omitted).
[31] FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 8.06[4] (Release No.2, 2nd ed.2005) (footnotes omitted). See also State Farm Mut. Auto. Ins. Co. v. Wrap-On Co., Inc., 626 So.2d 874 (La.App. 3 Cir.1993), writ denied, 93-2988 (La.1/28/94); 630 So.2d 800.
[32] Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 660 (La.1989) (alteration in the original).
[33] Lawson v. Mitsubishi Motor Sales of America, Inc., 04-839 (La.App. 3 Cir. 12/29/04); 896 So.2d 149, 153-54 (emphasis added).
[34] Id.
[35] Trial Transcript (10/1/2003), R. at 2148-49, vol. 9.
[36] Trial Transcript (10/7/2003), R. at 3181, vol. 13.
[37] Trial Transcript (10/7/2003), R. at 3182, vol. 13.
[38] Trial Transcript (9/30/2003), R. at 2047-48, vol. 9.
[39] If this case had been one in which the doctrine of res ipsa loquitur applied, the jury instruction given (regarding said doctrine) would have been appropriate and proper.
[40] Id. at 89 (emphasis added).
[41] Judgment and Reasons (2/26/2004), R. at 1581, vol. 7.
[42] Lawson v. Mitsubishi Motor Sales of America, Inc., 04-839 (La.App. 3 Cir. 12/29/04); 896 So.2d 149, 158.
[43] Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00); 774 So.2d 84, 89.
[44] Horton v. Mayeaux, 05-1704, pp. 4-5 (La.5/30/06); 931 So.2d 338 (emphasis added).
[45] LA.CODE CIV. PROC. art.1973 provides:

A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
(Emphasis added).
[46] Lamb v. Lamb, 430 So.2d 51, 53 (La.1983) (emphasis added).
[47] Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00); 772 So.2d 94, 104-105 (footnotes omitted) (emphasis added).
[48] LA.CODE CIV. PROC. art.1973 (alteration in original).
[49] Judgment and Reasons (2/26/2004), R. at 1581-1582, vol. 7 (citations omitted).
[50] LA.CODE CIV. PROC. art.1973.
[51] LA.CODE CIV. PROC. art.1973.
[52] Lamb v. Lamb, 430 So.2d 51, 53 (La.1983) (alteration in original).